Elijah M. Watkins (ISB No. 8977)
Aaron R. Bell (ISB No. 10918)
DORSEY & WHITNEY LLP
101 S. Capitol Boulevard, Suite 1100
Boise, ID 83702
T: (208) 617-2550
watkins.elijah@dorsey.com
bell.aaron@dorsey.com

Glenn B. Manishin (*pro hac vice* pending)
PARADIGMSHIFT LAW LLP
11410 Reston Station Blvd., Suite 586
Reston, VA 20190
T: (202) 256-4600
glenn@manishin.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| STEPHEN G. JOSEPH, an individual, and SGJ HOLDINGS, INC., an Idaho corporation,<br><br>Plaintiffs,<br>v.<br><br>KENNETH G. BROOK III, an individual, ADPROMPT, LLC, an Idaho limited liability company, KENNETH G. BROOK II, an individual, MARY L. BROOK, an individual, and MICHAELA M. MORROW, an individual,<br><br>Defendants. | Case No. ___________________<br><br>**COMPLAINT** |

Plaintiffs Stephen G. Joseph ("Joseph") and SGJ Holdings, Inc. ("SGJ Holdings"), by and through their attorneys, for their Complaint for damages and declaratory and injunctive relief against Defendants Kenneth G. Brook III ("Brook"), AdPrompt, LLC ("AdPrompt"), Kenneth G. Brook II ("Father"), Mary L. Brook ("Mother"), and Micheala M. Morrow ("Morrow") allege as follows:

## PARTIES

1. Joseph is an individual residing in Meridian, Idaho. Joseph was the lead and largest investor in Defendant AdPrompt, LLC and performed substantial business-development, operational, and executive functions for the AdPrompt venture over a period of nearly two years during 2023-2025.

2. SGJ Holdings, an Idaho corporation in good standing, is the entity through which Joseph makes investments in startup and emerging growth ventures. Joseph is the owner and president of SGJ Holdings.

3. Brook is an individual residing in Boise, Idaho. He caused AdPrompt to be formed in 2022, is designated with the Idaho Secretary of State as its managing member, and holds himself out to investors and the general public as the company's founder and chief executive officer.

4. AdPrompt, an Idaho limited liability company with its principal place of business in Boise, Idaho, is an early-stage advertising-technology company that, among other activities, is developing the "AdPrompt.AI" technology platform. AdPrompt is the legal entity through which Brook conducted the corporate and securities activities alleged below. Since 2022, AdPrompt has been administratively dissolved in Idaho on at least three occasions.

5. Father is Brook's father and resides in Boise, Idaho.

6. Mother is Brook's mother and resides in Boise, Idaho.

7. Morrow is Brook's sister and resides in Meridian, Idaho.

## JURISDICTION AND VENUE

8. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Count I arises under federal law. The Court has supplemental jurisdiction over the remaining state-law claims, including the claims against Father, Mother, and Morrow, under 28 U.S.C. § 1367(a).

9. Venue is proper in this District because Defendants reside in, are organized in, or conduct business in Boise, Idaho, and the acts and circumstances from which the claims in this case arise occurred principally in Boise, Idaho.

## FACTUAL ALLEGATIONS

10. Brook has exercised and continues to exercise unilateral authority over AdPrompt's fundraising, investor communications, equity arrangements, token assets and business operations.

11. AdPrompt's business materials presented the company as developing an artificial intelligence platform that would create, launch, manage, and optimize digital advertising campaigns.

12. Those promotional and investment-solicitation documents specifically characterized the company's AdChain product and AdToken cryptocurrency, identified by the ticker ADT, as key components of its commercial ecosystem.

13. Brook personally communicated with prospective investors and counsel, including but not limited to Joseph, concerning investments in AdPrompt equity and the grant or allocation of AdToken assets for early-stage corporate investors. Brook did not prepare, or direct the Company's attorneys to prepare, a private placement memorandum ("PPM") with respect to equity investments in the company, did not disclose material risks or other material business and investment information about AdPrompt to potential investors and, as alleged further herein, made repeated and material misstatements, omissions and misleading representations in his communications with purchasers and holders of the company's securities.

14. Brook personally promised investors that their capital investment in AdPrompt would combine both an equity interest and an allocation of AdToken cryptocurrency.

15. Joseph, SGJ Holdings, and later investors whom Joseph introduced to AdPrompt provided money, services and business-development support to AdPrompt in reliance on Brook's representations and commitments.

16. Brook furnished Joseph with numerous documents describing the AdPrompt business model and development plans in October 2023 when he asked Joseph to help him build the AdPrompt websites. Those websites were for both AdPrompt and AdToken. At or around the same time, Brook further solicited Joseph to become an investor/advisor and furnished Joseph with the original documents associated with Brook's blockchain work and earlier token launch in 2017. These documents were provided because Brook sought to emphasize the legitimacy of his work and the value of the tokens as part of the first investment "tranche."

The Angel Investment

17. In early October 2023, Brook and AdPrompt solicited an investment of $30,000 from Joseph. Brook promised in writing that in return for being the company's first, or "Angel," investor, Joseph would receive 2 percent (2%) of AdPrompt's equity and a substantial grant of AdTokens. Thereafter, on October 30, 2023, Brook asked AdPrompt's attorneys by email to prepare the necessary legal papers to formally memorialize the transaction, stating: "My angel investor is ready…. We've settled on 2% equity in AdPrompt, LLC and [redacted] amount of AdToken in exchange for $30,000."

18. The next day, October 31, 2023, Joseph and AdPrompt executed a letter of intent ("LOI") concerning the equity component of Joseph's initial Angel investment. That $30,000 investment was designated to "further accelerate our growth and deliver on the company initiatives outlined in the '90-Day Business & Product Development Overview document' provided to [Joseph] on October 30th, 2023." The LOI provided for the two percent (2%) equity interest in AdPrompt that Brook had promised and confirmed by email to his attorneys. The LOI

represented that AdPrompt would prepare a "definitive Equity Purchase Agreement, which will soon be provided by Perkins Coie [then outside counsel to AdPrompt], and will detail all terms and conditions of the transaction."

19. The executed LOI identified no contingency or condition precedent, and Joseph fully performed by supplying the investment consideration. Although Joseph's "capital injection" was specifically identified as being "instrumental in advancing our strategic goals and help to bring AdPrompt.Ai to market," Defendants Brook and AdPrompt did not deliver the "definitive" legal document(s) memorializing the equity (or token) components of this and other investment transactions, because, on information and belief, Brook did not authorize or pay Perkins Coie to prepare them.

20. Joseph's financial backing was sought again by Brook after just a few months. Joseph agreed to supply additional funding. Accordingly, on or about January 18, 2024, Joseph and AdPrompt executed a second letter of intent, styled as an "amendment" for "additional equity exchange" (the "Amended LOI"), providing for the grant of an additional two percent (2%) "equity stake" in AdPrompt. Specifically, the Amended LOI stated: "An additional 2% ownership in AdPrompt, LLC will be granted, resulting in a cumulative total of 4% equity ownership" for an "additional investment" of $30,000. The Amended LOI provided further that "[t]he additional terms mentioned herein will be effective upon execution of an addendum to the definitive Equity Purchase Agreement."

21. Together, the two LOIs provided for Joseph to receive a cumulative four percent (4%) equity interest in AdPrompt. Joseph reasonably relied on those representations and promises, including that "[u]pon receipt of your acceptance, we will proceed with the preparation of the necessary documentation."

22. Joseph made an additional cash investment as part of the initial Angel tranche. On March 8, 2024, Joseph paid $15,000 by check to AdPrompt. Taken together, Joseph's seed investments totaled $75,000. That is the amount reflected on the first Simple Agreement for Future Equity ("SAFE") between SGJ Holdings and AdPrompt, as alleged further below.

23. Defendants Brook and AdPrompt have not issued Joseph any membership interests, shares, or other formal equity interests. Brook and AdPrompt listed, and on information and belief continue to list, Joseph as a SAFE holder (see below) in the company's virtual cap table stored online via Carta, the capitalization-management platform used for the company's ownership records, but through counsel have refused to honor the LOIs because AdPrompt never delivered the promised "definitive" agreement.

24. The promised grant of equity interests in AdPrompt was a material term which reasonably induced Joseph to make and increase his capital investments in the company and to provide the executive services he performed, for the benefit of the venture, for nearly two years.

25. In connection with the Amended LOI, Joseph confirmed in writing that the parties' agreement included an additional allocation of 10 million AdToken. Brook responded in writing that the parties were in agreement on both the equity and token components. Although this and other AdToken transactions were obligations of the company, Brook supplied those cryptocurrency assets from his own personal blockchain "digital wallet."

<u>Additional Funding & The SAFE Agreements</u>

26. AdPrompt did not deliver the promised documentation concerning the equity or token transactions. As a result, Joseph finally insisted that his Angel investments needed to be memorialized with formal legal documentation. Brook proposed a SAFE. SAFEs are investment documents widely available from reputable venture capital and technology accelerator firms, often used by startups to document early-stage investments.

27. In May 2024, SGJ Holdings and AdPrompt consequently entered into a SAFE in the principal amount of $75,000, reflecting the total of Joseph's initial Angel investment. That SAFE was backdated by AdPrompt to October 2, 2023, corresponding to the date of Joseph's first $30,000 payment.

28. In July 2024, SGJ Holdings and AdPrompt entered into a second SAFE in the principal amount of $50,000. That SAFE reflected an additional seed investment made by Joseph.

29. AdPrompt faced serious financial pressure, product-development delays and operational challenges. On several occasions, Joseph was asked to provide emergency capital or loans to keep the venture operating. The largest of these requests was for approximately $200,000 in Summer 2024. AdPrompt required additional capital because its operating expenses had depleted its available cash. The funds for this investment were supplied to AdPrompt through SGJ Holdings.

30. Joseph and Brook agreed to a series of governance reforms, enhanced investor protections, financial oversight, and additional equity—for a total of ten percent (10%)—as conditions to this more substantial capital infusion. Joseph memorialized those requirements in an email to Brook dated August 28, 2024. Brook orally agreed to the terms set forth in the email in a conversation witnessed by Joel Camacho, then (fractional) Head of Finance for AdPrompt. Brook committed that he would prepare, or cause to be prepared, the necessary documents. On or about September 1, 2024, SGJ Holdings and AdPrompt accordingly entered into a third SAFE in the principal amount of $200,000, with the remaining agreed terms to be documented in a later definitive agreement. Defendants Brook and AdPrompt did not prepare or execute that definitive agreement.

31. AdPrompt recorded all three SAFE transactions and associated AdToken distributions with its Carta cap table. The three SAFE investments by Joseph through SGJ

Holdings alone totaled approximately $325,000.00. The equity interests called for by the two prior LOIs have not been issued and are not recorded on the company's Carta cap table.

32. Through those various investments and a subsequent emergency loan (see below), Joseph and SGJ Holdings supplied more than $385,000.00 in immediately available cash to AdPrompt. Joseph and SGJ Holdings were responsible for more than eighty-five percent (85%) of the outside startup capital received by AdPrompt during the relevant period. Neither AdPrompt nor Brook, however, has accounted for the use of such funds or otherwise supplied financial statements or financial updates to investors in the company, including Joseph.

33. Brook allocated approximately 36 million AdTokens, but Defendants Brook and AdPrompt did not provide the promised legal agreement supporting transfer to Joseph and SGJ Holdings or, on information and belief, to any other investor in AdPrompt.

Joseph's Operational Role and 2025 "Side Letter" Equity Grant

34. Joseph served as AdPrompt's chief operating officer and the principal executive responsible for AdPrompt's business and operations for approximately two years. AdPrompt's fundraising materials conspicuously identified Joseph as the company's lead investor and head of business development. AdPrompt issued an email address at its own domain for Joseph and listed that address alongside Brook's address for investor inquiries.

35. Joseph handled AdPrompt's business development, company strategy and operational matters. He authored and materially contributed to AdPrompt's website content and marketing materials. Brook and AdPrompt accepted the benefit of and used Joseph's services and work product while representing him to third parties as a senior member of the venture.

36. By March 2025, Joseph's investments and contributions substantially exceeded the consideration contemplated when the parties had agreed in 2023 to an initial four percent (4%) equity interest. Brook and AdPrompt therefore agreed on compensation terms for Joseph and

expressly committed to memorialize them in a "side letter" agreement.

37. Brook confirmed by email and text message that he consented to the side letter, and expressly promised to "get this finalized" and to send the letter on to the Company's lawyers, yet Brook has refused to execute the letter agreement, to issue any part of that total 10% equity stake to Joseph as set forth in the side letter, or to pay Joseph the fair value of his executive services. After accepting the benefit of Joseph's additional funding and services, Brook refused to stand by his promises to his early and largest investor, who had performed substantial management functions for the Company.

<u>The 2025 Emergency Loan</u>

38. During the winter and spring of 2025, AdPrompt again experienced an urgent cash shortage and needed additional funds to continue operating. At Defendants Brook and AdPrompt's request, SGJ Holdings provided AdPrompt an emergency loan of $60,000 at zero percent (0%) interest. That loan was separate from SGJ Holdings' investments and was intended to supply immediate operating cash while the Company allegedly lacked sufficient operating capital.

39. Defendants Brook and AdPrompt repaid or credited $20,000 of that loan, leaving an unpaid principal balance of $40,000.

40. Although due, AdPrompt has not repaid the balance. Brook and AdPrompt expressly acknowledged that Plaintiffs acted as lenders, including in a September 2025 letter which specifically references Joseph and SGJ Holdings as "lender[s] to the company."

<u>Defendants Brook and AdPrompt Integrated AdPrompt, AdChain, and AdToken in Their Fundraising Plans</u>

41. From the outset, Brook represented AdToken as an integral part of the consideration for the investments of Joseph and others and as a core technology of the AdPrompt.AI platform.

42. AdPrompt's investor decks described ADT as an ERC-20 utility token and the native digital asset of the AdPrompt.AI ecosystem. These and related solicitation materials represented that ADT would enable blockchain functions within AdPrompt, including content and advertising provenance, compliance functions, micropayments, metered access and tokenized artificial-intelligence models.

43. AdPrompt's investor "prospectus" likewise described AdToken technology as enhancing AdPrompt.AI and stated that the digital token would support the venture from both a technical and financial standpoint. That prospectus represented that investment proceeds would be used for marketing, product development, operations and continued development of the AdPrompt.AI and AdToken websites. In May of 2025, an AdChain Whitepaper authored by Brook likewise described AdPrompt, AdChain, and AdToken as an integrated advertising ecosystem. The May 2025 whitepaper described AdPrompt as the user-facing artificial-intelligence layer, AdChain as the protocol layer, and AdToken as an external Ethereum-based asset used for governance and ecosystem incentives.

44. On June 17, 2025, AdPrompt issued an investment and token-grant term sheet identifying AdPrompt, LLC as the company and Brook as founder and chief executive officer. The term sheet proposed a SAFE financing with a $10 million pre-money valuation cap and a $1 million target raise.

45. The same term sheet reserved up to 55 million AdToken, representing 5.5 percent (5.5%) of a stated one-billion token supply, for fundraising allocations. The term sheet contemplated distribution after an anticipated "token migration" event then scheduled for the third or fourth quarter of 2025, followed by lockup periods. The term sheet represented that proceeds would fund commercial rollout of AdPrompt.AI, continued development of AdChain, and integration of AdToken throughout the AdPrompt ecosystem.

46. Defendants Brook and AdPrompt's subsequent fundraising solicitation materials sought $3 million through a token-related SAFE presale to complete AdChain integration and expand the AdPrompt platform. These later materials continued to present AdPrompt, AdChain, and AdToken as parts of one commercial investment opportunity. The fundraising materials distributed in connection with sale of SAFEs and cryptocurrency assets therefore presented AdToken as part of AdPrompt's technology, financing and investor-compensation strategy rather than as an unrelated project.

47. Nonetheless, Defendants Brook and AdPrompt have refused to recognize the previously-issued AdTokens as investment assets of the company and, despite repeated requests and demands, excluded those tokens from the "migration" to a different and separate blockchain. On information and belief, the token migration event has not yet occurred because, as further explained below, after Joseph's departure, the Company's software-development efforts materially deteriorated, requiring a substantial rebuild of the necessary functionalities to support advertising customers as a business matter.

<u>Exclusion, Nonperformance and Resulting Harm</u>

48. Throughout 2025, relations between Joseph, Brook and AdPrompt remained courteous. For instance, in July 2025, Brook promised Joseph with respect to the "side letter" agreement:

> I will go through this over the weekend. Assuming all looks good, which I don't have reason to believe it wouldn't look good, then I'll sign.
>
> I do appreciate your trust and patience over the months as we continue to build the company. We will get this squared away and will have a strong foundation for sustainable growth.

49. Beginning in August 2025, however, Brook removed Joseph without notice from AdPrompt's systems and excluded him from company decision-making. Brook took those steps after Joseph and SGJ Holdings had supplied most of AdPrompt's outside capital and after Joseph

had performed substantial services for the venture. Defendants Brook and AdPrompt provided no business rationale for Joseph's removal, although it was followed Joseph's criticism to Brook regarding the lack of corporate transparency and the company's continued failure to produce a viable digital advertising product.

50. Both before and after the August 2025 separation, Brook represented publicly on behalf of AdPrompt that the company had nearly 80 existing advertising customers. Nonetheless, at least through that time, AdPrompt had not realized or reported to investors any significant revenues aside from investment capital. On information and belief, AdPrompt has spent substantially all invested capital to fund operations and remains effectively insolvent. It recently sent an investment update on or about October 16, 2026, reporting that the Company now finally has an "AdPrompt 360 pilot underway" but is still "working to close our seed round."

51. Defendants Brook and AdPrompt did not issue the four percent (4%) equity interest reflected in the two letters of intent.

52. Defendants Brook and AdPrompt did not issue the total equity interest of ten percent (10%) that Brook agreed to memorialize in a "side letter" agreement in 2025.

53. Defendants Brook and AdPrompt did not repay the remaining $40,000 balance of the emergency loan when due and have conditioned repayment on Plaintiffs' waiver by Joseph and SGJ Holdings of all claims against the company.

54. After removing Joseph, Defendants Brook and AdPrompt continued to develop and solicit investment for the same integrated AdPrompt, AdChain, and AdToken venture that Joseph had funded and helped manage. Defendants Brook and AdPrompt continue to use the business value, investor relationships, strategy, content and work-product generated through Joseph's efforts without providing the ownership, repayment or token value they promised.

55. As a direct result, Joseph and SGJ Holdings have been deprived of money, formal

equity ownership interests, token value, control rights, and the value of the services and intellectual property they contributed to the venture.

56. Joseph and SGJ Holdings have attempted resolution of this matter outside of litigation, but Brook has refused.

57. As indicated above, AdPrompt and Brook plan to undertake a token "migration" from AdToken to a new cryptocurrency asset. Defendants Brook and AdPrompt have not included the ADT tokens issued to Joseph and other early-stage Angel investors in that migration, thereby depriving them, or threatening to deprive them, of part of the consideration for their investments.

Self-Dealing and Piercing the Corporate Veil

58. At all relevant times, Brook has operated AdPrompt as his alter ego, and has failed to segregate properly corporate, token and personal assets or revenues.

59. Brook commingled corporate and personal funds, used AdPrompt cash and assets to satisfy housing expenses and other personal financial obligations, never maintained appropriate corporate records, siphoned funds out of the company without disclosure or authorization, and was simultaneously extracting value (through salary, expense reimbursements, and token transfers) while leaving the company unable to repay its obligations, such as the emergency loan extended by Joseph. Specifically, among other things Brook (a) purchased approximately $1,000 worth of dinnerware for his mother and father (Mother and Father) through the Company in December 2024, (b) used Company funds as a security deposit for a new high-end apartment in downtown Boise, (c) spent corporate cash on personal entertainment and personal expenses, including dating, and (d) purchased desks for the AdPrompt office only to give those corporate furnishings to his sister (Morrow) days later.

60. Brook has therefore treated AdPrompt as a vehicle for personal dealings rather than as a separate legal entity.

**COUNT I**
**(Violations of Rule 10b-5 and Section 10(b)**
**of the Securities Exchange Act of 1934)**
**(Defendants Brook and AdPrompt)**

61. Plaintiffs incorporate by reference the allegations above as though fully set forth herein.

62. The SAFEs and AdTokens issued in consideration of the capital investments by Joseph and other early-stage investors in the AdPrompt venture represent "investment contracts" and securities subject to the Securities Exchange Act of 1934 and implementing regulations promulgated by the Securities and Exchange Commission ("SEC"), including SEC Rule 10b-5. Specifically with respect to the tokens, where (as here) crypto assets are marketed as part of an investment scheme with profit expectations tied to the issuer's efforts, they are treated as securities under federal law.

63. Defendants Brook and AdPrompt intentionally made numerous material misrepresentations, omissions and misleading statements in connection with the offering and sale of securities. Plaintiffs relied on those material misrepresentations, omissions and misleading statements, which proximately caused economic losses recoverable under Rule 10b-5 and 15 U.S.C. § 78j(b).

59. Brook's misrepresentations, omissions and misleading statements include, *inter alia*:

(a) representing that Joseph would receive equity in exchange for his early Angel investment, when Brook never intended to honor these commitments;

(b) falsely representing that a formal side letter would be executed to document Joseph's cumulative 10% equity stake;

(c) failing to disclose that all AdToken given to Joseph and other investors were transferred from Brook's personal wallet assets rather than issued by the Company;

(d) failing to disclose the Company's true financial condition when soliciting the $60,000 emergency loan from Joseph or at any relevant time thereafter;

(e) never disclosing that AdPrompt was insolvent in 2025 or any other time;

(f) concealing the fact that Brook's former co-founder (Ridhi Tatineni) had been forced to front money from her personal accounts to pay AdPrompt's software developers; and

(g) affirmatively misrepresenting that the company had signed up nearly 80 active digital advertising customers when the reality is that the product was not commercially functional and no significant revenues have ever been realized.

64. Plaintiffs are accordingly entitled to damages in an amount to be proven at trial which Plaintiff estimates will exceed $465,000, plus (a) prejudgment interest at the lawful rate from October 1, 2025, and (b) attorneys' fees, court costs and related expenses incurred by Plaintiffs as a proximate result of Defendants Brook and AdPrompt's unlawful conduct.

**COUNT II**
**(Violation of Idaho Securities Act)**
**(Defendants Brook and AdPrompt)**

65. Plaintiffs incorporate by reference the allegations above as though fully set forth herein.

66. Idaho Code § 30-14-501(1) makes it unlawful to "employ any device, scheme, or artifice to defraud" or to "obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made... not misleading."

67. The material misrepresentations, omissions and misleading statements made by Defendants Brook and AdPrompt in connection with the offering and sale of securities constitute violations of the Idaho Securities Act.

68. Brook is jointly and severally liable for damages under Idaho Code § 30-14-509(g).

69. Plaintiffs are accordingly entitled to damages in an amount to be proven at trial which Plaintiff estimates will exceed $465,000, plus (a) prejudgment interest at the lawful rate from October 1, 2025 through present, and (b) attorneys' fees, court costs and related expenses incurred by Plaintiffs as a proximate result of Defendants Brook and AdPrompt's unlawful conduct.

## COUNT III
**(Common Law Fraud)**
**(Defendants Brook and AdPrompt)**

70. Plaintiffs incorporate by reference the allegations above as though fully set forth herein.

71. Defendants Brook and AdPrompt knowingly and deliberately made false misrepresentations of material facts and intentionally concealed material facts from Joseph and SGJ Holdings, with the intent that Plaintiffs rely on them. These misrepresentations specifically included that Joseph was a member of the senior executive team and would receive a total equity interest of 10% in AdPrompt.

72. Plaintiffs reasonably relied on such misrepresentations and concealment and were injured as a proximate result.

73. Defendants Brook and AdPrompt's conduct was and continues to be egregious, wanton and malicious.

74. Plaintiffs are accordingly entitled to damages in an amount to be proven at trial which Plaintiff estimates will exceed $465,000, plus (a) prejudgment interest at the lawful rate from October 1, 2025 through present, and (b) attorneys' fees, court costs and related expenses incurred by Plaintiffs as a proximate result of Defendants Brook and AdPrompt's unlawful conduct.

**COUNT IV**
**(Breach of Contract)**
**(Defendants Brook and AdPrompt)**

75. Plaintiffs incorporate by reference the allegations above as though fully set forth herein.

76. Defendants Brook and AdPrompt breached their contractual obligation to repay the emergency loan extended by Joseph in 2025. Under Idaho Code § 9-505(1), oral agreements for loans due in less than one year are enforceable.

77. AdPrompt's belated offer through counsel to repay by December 31, 2026, contingent on resolution of all outstanding claims, is also a material breach in that a debtor cannot unilaterally impose new conditions on repayment. The loan was due upon demand or within a reasonable time, and the December 1, 2025 default date demanded by Joseph is a reasonable measure of the parties' mutual intent.

78. Defendants Brook and AdPrompt breached their contractual obligation to issue Joseph and SGJ Holdings a cumulative 10% equity interest in AdPrompt. The LOIs and associated communications between the parties evidence a clear intent to be bound and are therefore enforceable on that basis. In addition, a contract is enforceable even if unsigned where, as here, there is partial performance or if the parties' conduct evidences acceptance. Joseph's continued investment and operational work after March 2025, in reliance on the promised 10% equity, constitutes partial performance.

79. Alternatively, the equity grant portion of the LOIs and "side letter" are enforceable on grounds of promissory estoppel in that (a) Defendants Brook and AdPrompt made a specific promise on which Plaintiffs reasonably relied, (b) substantial economic loss was caused by that reliance; (c) the loss was or should have been foreseeable to the promisor; and (d) injustice can be avoided only by enforcing the promise.

80. Plaintiffs are accordingly entitled to damages in an amount to be proven at trial which Plaintiff estimates will exceed $465,000, plus (a) prejudgment interest at the lawful rate from December 1, 2025 through present, or (b) specific performance of their right to 10% of AdPrompt equity.

**COUNT V**
**(*Quantum Meruit*/Unjust Enrichment)**
**(Defendants Brook and AdPrompt)**

81. Plaintiffs incorporate by reference the allegations above as though fully set forth herein.

82. Joseph's executive management work at AdPrompt conferred a benefit upon Defendants Brook and AdPrompt, with appreciation or knowledge of that benefit by both Brook and AdPrompt. Acceptance of the benefit under these circumstances makes it inequitable for Defendants Brook and AdPrompt to retain that benefit without payment of the fair value of Joseph's key services.

83. Joseph performed operational duties typically associated with senior corporate leadership, including strategic planning, product direction, and bringing in more than 85% of the company's investment capital. Acceptance and retention of those services by Defendants Brook and AdPrompt is demonstrated by their designation of Joseph as the venture's "lead investor and head of Biz Dev." Brook and AdPrompt unquestionably appreciated these benefits; they accepted the money, used the labor, and specifically promoted Joseph's involvement to other investors. The retention of these benefits after Joseph's removal is manifestly inequitable.

84. Joseph is accordingly entitled to damages in the amount of the reasonable value of services rendered on the basis of Defendants Brook and AdPrompt's implied promise to pay as well as the value of the intellectual property unjustly retained by Defendants Brook and AdPrompt, in an amount to be proven at trial, which Plaintiffs estimate will exceed $100,000.

## COUNT VI
**(Avoidance of Voidable Transfers Under Idaho Code §§ 55-913 and 55-914)**
**(Defendants Father, Mother, and Morrow)**

85. Plaintiffs incorporate by reference the allegations above as though fully set forth herein.

86. Brook used company funds to make purchases of personal items, including dinnerware, and transferred these items to his parents, Father and Mother.

87. On information and belief, Brook transferred company money and other goods purchased with company funds to his parents, Father and Mother.

88. Brook also transferred furniture purchased for company use with company funds to his sister, Morrow.

89. On information and belief, Brook transferred company money and other goods purchased with company funds to his sister, Morrow.

90. At the time of the transfers described above, AdPrompt had creditors, including Joseph and SGJ Holdings.

91. At the time of those transfers, AdPrompt was insolvent.

92. Brook caused the transfers without AdPrompt receiving reasonably equivalent value in exchange.

93. Brook caused the transfers with actual intent to hinder, delay, or defraud Joseph and SGJ Holdings in the collection of their claims.

94. Joseph and SGJ Holdings are entitled to damages in an amount to be proven at trial equal to the value of the transferred property.

## PRAYER FOR RELIEF

**WHEREFORE**, Joseph and SGJ Holdings respectfully pray for judgment as follows:

A. That the Court award damages to Plaintiffs in an amount to be proven at trial which Plaintiffs estimates will exceed $465,000, plus interest at the highest rate permitted by law since October 2, 2023.

B. That the Court issue an equitable decree and enter judgment commanding specific performance of Plaintiffs' contractual right to 10% of AdPrompt's corporate equity;

C. That the Court award damages for quantum meruit and unjust enrichment under Count V to Plaintiff Joseph for the services and benefits Plaintiff provided to Defendants Brook and AdPrompt in such amount as proved at trial which Plaintiffs estimates will exceed $100,000.

D. That the Court award damages for the value of AdPrompt property and funds that were fraudulently transferred to Defendants Father, Mother, and Morrow in an amount to be proven at trial.

E. That the Court enter an order granting Plaintiffs preliminary and permanent injunctive relief prohibiting conduct that would frustrate an ultimate judgment, specifically the dissipation of AdPrompt assets;

F. That the Court award the costs of suit and reasonable attorneys' fees to Plaintiffs; and

G. That the Court provide such other and further relief as it may deem just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

Dated: November 5, 2026

DORSEY & WHITNEY LLP

*/s/ Elijah M. Watkins*
Elijah M. Watkins
Aaron R. Bell

PARADIGMSHIFT LAW LLP

Glenn B. Manishin (*pro hac vice* pending)

*Attorneys for Plaintiffs*